THE INHABITANTS OF PHILLIPS *versus* THE INHABITANTS OF KINGFIELD.

A witness who is introduced to prove that another witness is unworthy of credit, should be examined as to the general character of such witness for truth and veracity.

The character which a witness has acquired for truth is to be proved as a fact in the case, from which, combined with all the various matters in the testimony tending to establish or impair it, the jury will form their own opinion respecting the credit due to his statements.

The proper inquiry is, whether the witness knows the general character of the witness attempted to be impeached; and if so, what is his general reputation for truth?

On the cross-examination, the inquiry should be limited to the witness's opportunity for knowing the character of such witness; for how long a time and how generally such unfavorable reports have prevailed, and from what sources they have been derived.

It is not allowable to inquire of the impeaching witness whether he would believe the witness attempted to be impeached upon oath.

In our pauper laws, there is a marked distinction between the place of residence, or home, and the place of legal settlement. The latter cannot be changed without acquiring a new one. The former may be abandoned without evidence that another residence has been secured.

The expression of opinion by the presiding Judge, on the state of the facts of a case, is not a matter of legal exception.

THIS was an action of assumpsit for supplies furnished the wife and daughter of one Isaiah Wood, who was alleged in the plaintiffs' writ to have his legal settlement in the town of Kingfield. The general issue was pleaded and joined. The plaintiffs introduced evidence tending to show that the said Wood had resided and had his home in his father's family a year previous to, and was residing and had his home in Kingfield on the 24th day of January, 1816, the day of the incorporation of said town; and also that he had his residence there on the 21st day of March, 1821. The defendants introduced evidence tending to show that on neither of those days was the residence of said Wood in Kingfield; but that on both of those he was not only personally absent, but was residing and had his home in some other place. The defendants further introduced evidence tending to show that he resided and had his home in

the town of Westbrook for more than five years together af ..r the 21st of March, 1821. It appeared that said Wood was much absent from his wife and family, and that in the year 1820, or within a year of the 21st of March, 1821, he being absent, laboring from home, a small amount of supplies was furnished by the overseers of the poor of the town of Kingfield, where she then was found in destitute circumstances.

Said Wood was introduced as a witness by the plaintiffs, and the defendants introduced evidence tending to show that the character of said Wood was not good for truth and veracity. It was in evidence that said Wood left Kingfield at different times, but whether with the intention of changing his residence or not, and whether he took up a new residence with the intention of remaining, were facts contested, and a great variety of conflicting testimony in relation to all the facts in controversy was introduced, and the whole submitted to the jury. EMERY J. who presided in the trial, gave the following instructions and opinions, viz. —

1. Where a party attempts to impeach a witness, that party can ask only what is his general character for truth and veracity; but the other party *may ask his character under oath*, and to the belief which the one testifying would entertain of the one under oath, who is attempted to be impeached, and confine it to that.

2. If a man has a home, a temporary absence to seek employment, does not take it away.

3. If a man go away with a determination of taking up a permanent residence in a particular place, and does so take up his abode, his former residence is changed.

4. The testimony of the supplies furnished the wife of said Wood, is of no other use than as *helping* to show an intention to abandon his wife in leaving her unprovided; because the mere circumstance of supplies would not change the effect of the act of 1821, inasmuch as he had no control over the members of his family at the time.

To which opinions and instructions of the Court, the counsel of the defendants filed exceptions, which were allowed.

*Tenney*, for the defendants, cited the following authorities. *People* v. *Mather*, 4 Wend. 257; 1 Phil. Ev. 229; 1 Stark. Ev. 147; *Chelsea* v. *Malden*, 4 Mass. R. 131; *Townsend* v. *Billerica*, 10 Mass. R. 411; *Canton* v. *Bentley*, 11 Mass. R. 441; *Hallowell* v. *Saco*, 5 Greenl. 143; *Greene* v. *Windham*, 13 Maine R. 225; *Exeter* v. *Brighton*, 15 Maine R. 58; 2 Kent's Com. 346; *Arnold* v. *United Ins. Co.* 1 Johns. Cases, 66; *Harvard College* v. *Gore*, 5 Pick. 370; *Poland* v. *Wilton*, 15 Maine R. 363.

*Wells*, for the plaintiff, referred the Court to *Baring* v. *Norton*, 2 Fairf. 350; *Greene* v. *Buckfield*, 3 Greenl. 136; *Dixmont* v. *Biddeford*, 3 Greenl. 205; *Hallowell* v. *Saco*, 5 Greenl. 143.

The opinion of the Court was delivered by

SHEPLEY J. — One of the questions presented relates to the manner of examining a witness, who is introduced to prove that another witness is unworthy of credit. The authors of the elementary treatises on evidence do not perfectly agree in this matter; and the cases upon which they rely for their statements, are generally those arising at *nisi prius*, where there was little examination or discussion of principle. The rule as stated by Peake is, that " *viva voce* evidence to destroy the credit of a witness must be that of persons, who have known his general character, and who take upon themselves to swear from such knowledge, that they would not believe him upon his oath." Peake's Ev. 88. The rule as stated by Phillips, is in substance the same. He says, " the regular mode is to inquire whether they have the means of knowing the former witnesses's general character, and whether from such knowledge they would believe him on his oath." 1 Phil. Ev. 229.

Starkie says, " the proper question to be put to a witness for the purpose of impeaching the general character of another is, whether he could believe him upon his oath? When general evidence of this nature has been given to impeach the character of the witness, the opposite party may cross-examine as to

the grounds upon which that belief is founded." 1 Stark. Ev. ed. by Met. 182. It will be perceived, that the language of the last rule does not limit the witness to his knowledge of the character of the former witness for truth, but permits him to form his opinion from any knowledge, belief, or reputation, that the former witness has committed some crime, or been guilty of some immorality. And accordingly it has been held in North Carolina and Kentucky, that a party is not confined to the reputation of the former witness for veracity, but may impeach his general moral character. Under a literal application of the rule as stated by Starkie, the witness can form a law to suit himself as to what degree of moral delinquency shall be sufficient to destroy the credit of the former witness, and can apply his own law as his personal prejudices, errors, griefs, or interest, may dictate. And if the opposite party may inquire into the grounds, upon which his belief is founded, the result is, that every description, and every act of private vice and immorality and the prevailing suspicion of them, even if slanderous, may be introduced into a court of justice, and that against one who is neither called upon, nor prepared to meet them. It is however a well established rule, that no particular acts of immorality or crime can be stated. It would be productive of much wrong to individuals, as well as degrading to the administration of justice to expose within its halls the private vices and immoral acts by reputation connected with the characters of witnesses.

In the case of *Carlos* v. *Brook*, 10 Ves. 50, the Lord Chancellor says it had been decided to be competent to examine any witness to the point, whether he would believe that man upon his oath. It is not competent, even at law, to ask the ground of that opinion, but the general question only is permitted.

The rule, as stated by Swift, is more satisfactory and less liable to abuse in practice. He says, the only proper questions to be asked are, whether he knows the general character of the witness in point of truth among his neighbors, and what that character is, whether good or bad. And states, that his

Phillips *v.* Kingfield.

testimony must be founded on the common repute as to truth, and not as to honesty. Swift's Ev. 143.

One acquires a character for truth or the reverse, as he does for honesty, or chastity, or temperance, or the reverse. And it is this trait of character as a fact, that should be placed before a jury for their consideration in weighing the testimony. The opinions of a witness are not legal testimony except in special cases; such, for example, as experts in some profession or art, those of the witnesses to a will, and in our practice, opinions on the value of property. In other cases, the witness is not to substitute his opinion for that of the jury; nor are they to rely upon any such opinion instead of exercising their own judgment, taking into consideration the whole testimony. When they have the testimony that the reputation of a witness is good or bad for truth, connecting it with his manner of testifying, and with the other testimony in the case, they have the elements from which to form a correct conclusion, whether any and what credit should be given to his testimony. To permit the opinion of a witness, that another witness should not be believed, to be received and acted upon by a jury, is to allow the prejudices, passions, and feelings of that witness, to form, in part at least, the elements of their judgment. To authorize the question to be put, whether the witness would believe another witness on oath, although sustained by no inconsiderable weight of authority, is to depart from sound principles and established rules of law respecting the kind of testimony to be admitted for the consideration of a jury, and their duties in deciding upon it. It moreover would permit the introduction and indulgence in courts of justice of personal and party hostilities, and of every unworthy motive by which man can be actuated, to form the basis of an opinion to be expressed to a jury to influence their decision.

The observations of Justices Gibson and Duncan, in the case of *Kimmel* v. *Kimmel*, 3 S. &. R. 336, are just and appropriate. Mr. Justice Gibson says, "there is danger from the proneness so often observable in witnesses, to substitute their own opinion for that of the public, whose judgment cannot be

so readily warped by prejudice or feeling as that of the individual; and hence the policy of not requiring any intimate degree of knowledge respecting the person himself, or of bringing the witness too close to the scene. The reputation of the neighborhood is the only thing that is competent; and if the witness has acquired a knowledge of it by the report of the neighborhood, he is exactly qualified to be heard." Mr. Justice Duncan says, " opinion will not be evidence, for if it were, no witness would be safe from the shafts of calumny. No man is to be discredited by the mere opinion of another."

In *Wike* v. *Lightner*, 11 S. & R. 198, Tilghman C. J. says, " the law on this subject is accurately laid down in *Kimmel* v. *Kimmel*. In order to discredit a witness, you can examine only to his general character ;" and again, " you must never depart from general character." As to the question, whether he would believe the other witness on oath, he says, " a direct answer would not be objectionable, provided the belief was founded on the witness's knowledge of his general character ; otherwise, it would be nothing to the purpose." The mischiefs have to some extent been already stated, which might arise from permitting the witness to give his own opinion; and this remark of the Chief Justice is at variance with those before quoted from the case of *Kimmel* v. *Kimmel*, where the law is said to be accurately stated.

In *Gass* v. *Stinson*, 2 Sum. 610, Mr. Justice Story says, " where the examination is to general credit, the course in England is to ask the question of the witnesses, whether they would believe the party sought to be discredited, upon his oath. With us, the more usual course is to discredit the party by an inquiry, what his general reputation for truth is, whether it is good, or whether it is bad."

In the case of the *People* v. *Mather*, 4 Wend. 257, the subject is discussed, and it is said, " the rule, which, every thing considered, has been found safest on this subject, is to allow general evidence to be given of general character."

The true principle appears to be, to allow the character, which a witness has acquired for truth, to be proved as a fact

in the case, from which, combined with all the various other matters in the testimony tending to establish or to impair it, the jury will form their own opinion respecting the credit due to his statements. The words of the interrogatory, by which such testimony is to be extracted, are not very material. Perhaps as short and useful a form as any, might be to inquire, whether he knows the general character of the witness? and if the answer be in the affirmative, what is his general reputation for truth? And on the cross-examination, the inquiry may extend to the witness's opportunity for knowing the character of the other witness; for how long a time, and how generally the unfavorable reports had prevailed; and from what persons he has heard them. This will present the whole facts respecting the character for truth to the jury, and that is all that can be legitimate or useful. Every thing else is much better suited to mislead, than to instruct them; and after this decision has been regularly published, will in our practice be excluded.

It does not appear, that the presiding Judge did more in this case than make certain remarks respecting the proper course to be pursued in the introduction of testimony of this description; or that any proper testimony was excluded, or that the party was in any other way injured by them. And they do not, therefore, whether correct or not, afford sufficient reason for setting aside the verdict.

The second proposition is not the subject of complaint.

In our pauper laws, there is a marked distinction between the place of residence, or home, and the place of legal settlement. The latter cannot be changed without acquiring a new one. The former may be abandoned, without evidence that another residence has been secured. The third proposition relating to this subject is correct. And if, as the counsel assert, it was material to know whether a residence might be abandoned without evidence of a new one acquired, a specific instruction might have been obtained by a request. If the fourth proposition be objectionable, it is so, rather as an expression of an opinion on the state of the facts, which is not a matter of

legal exception, than as an exhibition of the law arising out of them. It assumes, that it was clearly established by the proof, that the husband had no control over the members of his family when the supplies were furnished; and if he had no such control, the instruction was fully authorized by the case of *Greene* v. *Buckfield*, 3 Greenl. 136. If the counsel thought that the assumption was unauthorized and injurious to the rights of the defendants, they might have requested instructions, that if the jury should find, that the supplies were furnished to those under his care and protection, he would not acquire a settlement in that town by the act of March 21, 1821.

*Exceptions overruled.*